AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

FILED

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

1.  2208 DESERT BREEZE DRIVE SW,
ALBUQUERQUE, NEW MEXICO 87121; and
2. MICHAEL KLINE (BORN IN 1976).

)
)
)
)
)
)
)

Case No.  MR 21-158

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A (incorporated by reference).

located in the _____ District of _____ New Mexico _____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distributing and possessing with intent to distribute a controlled substance |
| 21 U.S.C. § 846 | Conspiracy to distribute a controlled substance |
| 18 U.S.C. § 922(g) | Being a prohibited person in possession of a firearm and ammunition |

The application is based on these facts:
See the attached affidavit, which is incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Leysha López Recci, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_telephonically sworn and electronically submitted_  *(specify reliable electronic means).*

Date:  February 3, 2021

*Judge's signature*

City and state:  Albuquerque, New Mexico

Honorable Kirtan Khalsa, U.S. Magistrate Judge
*Printed name and title*

**SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Leysha López Recci, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as **2208 Desert Breeze Drive SW, Albuquerque, New Mexico 87121**, hereinafter "SUBJECT PREMISES," further described in Attachment A, for the things described in Attachment B. I also submit this affidavit in support of an application for a warrant to search the body of MICHAEL KLINE (born in 1976) to collect a deoxyribonucleic acid (DNA) sample in the form of buccal swabs.

2. I have been a law enforcement officer since 2017, and I am employed as a Special Agent with the Federal Bureau of Investigation (FBI). I am currently assigned to the FBI's Albuquerque Violent Crime Task Force, where I investigate cases involving violent repeat offenders involved in federal drug and firearm related crimes, kidnappings, robberies, and fugitives. I also assist with investigations of drug trafficking organizations and gang/criminal enterprises. I have received on-the-job training and worked alongside experienced law enforcement officers, who have been recognized in courts across the United States as experts in drug trafficking and possession with intent to distribute controlled substances.

3. My investigative experience includes interviewing subjects, targets and witnesses; conducting surveillance; executing search and arrest warrants; supervising cooperating sources; analyzing records; and working on joint investigations and operations with law enforcement officers from other local, state and federal agencies. I have reviewed and analyzed thousands of telephone records to obtain evidence used in criminal investigations.

### SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

### PURPOSE OF THE AFFIDAVIT

4. Over the past year, the FBI and other law enforcement agencies have been conducting a joint investigation regarding the distribution of controlled substances and illegal possession of firearms by MICHAEL KLINE.

5. Based on evidence obtained in the investigation, and as described herein, I believe there is probable cause to believe the SUBJECT PREMISES are utilized by MICHAEL KLINE, hereinafter "KLINE," and contain evidence of federal criminal activity, specifically drug trafficking and illegal possession of firearms. The SUBJECT PREMISES appear to be the primary residence of KLINE and possibly his wife. Based on this investigation, I believe KLINE is a convicted felon, and he sells illegal drugs from the SUBJECT PREMISES and possesses firearms there.

6. This affidavit is submitted in support of a search warrant for evidence, fruits, and instrumentalities of violations of:

   A. 21 U.S.C. § 841(a)(1) – Distributing and possessing with intent to distribute a controlled substance;

   B. 21 U.S.C. § 846 – Conspiracy to distribute a controlled substance; and

   C. 18 U.S.C. § 922(g) – Being a prohibited person in possession of a firearm and ammunition.

7. I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Any observations referenced herein that I did not personally witness were relayed to me in oral or written reports by members of the investigative team, who assisted during this

**SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

investigation. All figures, times, and calculations set forth herein are approximate. Unless otherwise specified, weights of controlled substances are approximate and are based on net measurements.

## EVIDENCE SOUGHT DURING SEARCH

8. Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

9. Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

10. Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not limited to, packaging

**SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances. Drug dealers commonly store these items on their person, in their residences, in their businesses, in the residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

11. Drug traffickers often maintain records of their transactions in a manner similar to record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

12. Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

13. The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including

**SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphone, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones. The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

14. Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes, and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

15. Other evidence of transportation, ordering, possession and sale of drugs can include the following: telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings book, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually

SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

anywhere.

16. Drug traffickers usually sell their product for cash.  Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

17. Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate, and businesses, both real and fictitious.  They also try to secret, transfer, and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace.  This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws.  Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

18. Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information),

### SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

19. The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital services are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

20. Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property, and their drugs. They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Smartphones, tablets, cellular phones, digital cameras, and other digital

devices often have the capability to take still photos and videos and save them indefinitely on the device's storage medium.  Drug traffickers frequently use these devices to take their photographs and videos.

21. Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

22. I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

23. I am aware that firearms are instrumentalities of the crime of drug trafficking, particularly in instances involving subjects who have committed prior violent crimes and/or firearms violations. It has been my experience that criminals who illegally possess firearms often do not part with such firearms, as it may be difficult for criminals to acquire firearms.  Based on my training and experience, these individuals often utilize cellular telephones to facilitate the illegal purchase and sale of firearms.  I am aware of individuals that travel across state lines to obtain firearms, because they believe those firearms are less likely to be linked to criminal activity in their home state.

24. Drug traffickers often conceal evidence of drug dealing in vehicles of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing, documents and electronic storage devices (and their contents), evidence tending to show the distribution of drugs

**SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

(such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

25. Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

26. Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts. These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and

## SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

related digital media.

27. A list of items agents seek authority to seize is in Attachment B.

### COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

28. As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the SUBJECT PREMISES, in whatever form they are found. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media and other storage media. For this reason, I submit that if a computer, digital medium, or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

29. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of data either from accidental or intentional destruction. This is true because of the following:

    A. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires

## SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of the data stored, and would be impractical and invasive to attempt on-site.

B. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

C. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-side reviewing with specialized forensic tools.

30. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

## BACKGROUND ON THE INVESTIGATION

31. Over the course of this investigation, agents utilized a confidential source (CS-1) to conduct controlled drug purchases from KLINE at the SUBJECT PREMISES.  Agents have also obtained information from a different confidential source (CS-2) and other law enforcement investigations regarding KLINE's continued drug trafficking and illegal firearm possession.

32. This affidavit is based upon my personal knowledge as a case agent in the investigation, as well as agents and officers who have assisted me in the investigation.  In addition, I have developed information I believe to be reliable from additional sources, including but not limited to:

    A. Information provided by members of the investigative agencies, including oral and written reports that I have received directly or indirectly from the agents;

    B. Results of physical surveillance conducted by agents during the investigation;

    C. Review of toll records and subscriber information;

    D. Information derived from consensually recorded conversations;

    E. Information derived from lawfully intercepted telephone conversations and text messages;

    F. Records from commercial and law enforcement databases;

    G. Information provided by confidential sources; and

    H. Controlled drug purchases.

### The Confidential Sources

33. During the course of this investigation, which remains active, case agents utilized the following Confidential Sources ("CS" for both singular and plural) to obtain information about KLINE's drug trafficking activity.

34. **CS-1** began cooperating with the FBI in 2020 and is currently facing felony charges.  CS-1 hopes to get a positive recommendation from law enforcement on CS-1's pending criminal matters.  CS-

SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

1 positively identified several subjects of the investigation, provided information about the SUBJECT PREMISES, and conducted controlled drug purchases from KLINE. Information provided by CS-1 resulted in the seizure of methamphetamine and other controlled substances. CS-1 has prior felony convictions for burglary, unlawful taking of a vehicle, trafficking a controlled substance, and armed robbery. CS-1 has received approximately $500 in financial assistance from law enforcement.[1] I found the information from CS-1 to be reliable because much of it was corroborated by independent information, other law enforcement investigations, controlled drug buys, and physical and electronic surveillance. The FBI ended cooperation with CS-1 in November 2020, after CS-1 reported having a possible "mental breakdown."[2] The majority of CS-1's cooperation relevant to this investigation happened prior to November 2020. Throughout the cooperation period, CS-1 followed instructions and regularly communicated with the case agents. To my knowledge, CS-1's information has not been found to be false or misleading.

35. **CS-2** has been cooperating with the FBI for approximately 5 years. CS-2 personally knows several gang members and has been an associate of the Syndicato de Nuevo Mexico (SNM) prison gang for over 15 years. At one time, CS-2 distributed heroin for the SNM and later utilized the SNM and other gang members for protection when CS-2 became a multi-kilogram narcotics dealer. CS-2 knows KLINE regularly supplies narcotics to SNM members and has been present during drug deals conducted by KLINE at the SUBJECT PREMISES. CS-2 personally knows that KLINE has been a consistent drug supplier to a specific SNM member, referred to as "Buyer

---

[1] Financial assistance includes general payments and expenses incurred by the CS while supporting law enforcement operations. Expenses include but are not limited to fuel/gas for the CS's vehicle traveling to operations and missed work days/pay by the CS while supporting law enforcement investigations.
[2] In November 2020, CS-1 reported having a possible "mental breakdown" and was arrested by police attempting a traffic stop. About a month earlier, CS-1 went to receive medical attention and was arrested after a disturbance at the medical facility.

**SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

1" herein, providing ounces of drugs, including methamphetamine and heroin.  The identity of Buyer 1 is known to law enforcement, but not included in this affidavit to protect CS-2.  KLINE and Buyer 1 had an established relationship prior to this investigation, and CS-2 knows Buyer 1 has purchased drugs from KLINE on numerous occasions.  CS-2 estimates the last time Buyer 1 bought drugs from KLINE was in early January 2021.   Aside from personally witnessing drug trafficking at the SUBJECT PREMISES, CS-2's knowledge and reports about KLINE included in this affidavit come from CS-2's direct connection with Buyer 1.  Over the past few years, CS-2 has assisted the FBI in collection of evidence against members and associates of the SNM.  Information provided by CS-2 has led to the issuance of at least 22 federal search warrants, the arrest of multiple suspects, and the recovery of firearms, ammunition, U.S. currency and large quantities of controlled substances.  CS-2 has prior felony convictions for heroin trafficking, burglary, receiving a stolen vehicle, and larceny.  CS-2 does not have any pending charges.  CS-2 has received approximately $12,000 in financial assistance from the FBI.  I consider the information CS-2 provided to be reliable because much of it was corroborated through law enforcement investigations, controlled buys, and both physical and electronic surveillance.  To my knowledge, CS-2's information has not been found to be false or misleading.

## FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

36. As previously mentioned, this affidavit is being submitted for a search warrant to search the SUBJECT PREMISES, believed to be utilized by KLINE, to collect evidence, fruits and instrumentalities of violations of federal drug trafficking and firearm laws.

37. KLINE is a habitual offender with a lengthy criminal history dating back to the 1990's.  KLINE's violent record includes over seven (7) arrests between 2000 and 2004 for multiple domestic violence incidents, aggravated battery with bodily harm, possession of controlled substances,

**SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

receiving/transferring a stolen vehicle, and possession of a firearm by a felon.  KLINE has been convicted of conspiracy to commit armed robbery, and he has at least four (4) convictions for being a felon in possession of a firearm.  KLINE has two (2) federal convictions for incidents in 2004 and 2009.  Both federal convictions are for being a felon in possession of a firearm.  KLINE was sentenced to approximately 4 years in the Bureau of Prisons (BOP) for his first federal conviction and 8 years for his second conviction.  In 2004, KLINE was convicted in state court for possession of a controlled substance.  That case was dismissed in 2015, because KLINE had been incarcerated in federal prison since 2004.

38.  KLINE is a validated associate of the SNM prison gang.  During KLINE's time in BOP, KLINE requested protection and claimed he did not want to be affiliated with the gang because they asked KLINE to assault another inmate.  According to BOP reports, KLINE allegedly accumulated a drug debt owed to the SNM.

39.  Based on source reports obtained during this investigation, I believe KLINE maintains active association with the SNM in and outside prison.  KLINE was reported to act as a liaison between SNM members in the BOP and SNM members on the street.  KLINE is allegedly relaying information to SNM members outside prison, including but not limited to SNM orders to carry out murders and/or violence and information on suspected informants cooperating with law enforcement.

40.  The FBI has an ongoing racketeering investigation into the SNM and illegal activities carried out by its members and associates inside and outside prisons and jails.  The SNM is known for trafficking narcotics in large quantities.  SNM members often utilize and collaborate with other gangs and their members to conduct their drug business.  Many of the violent acts committed by the SNM throughout the years have been drug related.  Over the past 6 years, the FBI has arrested

**SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

dozens of SNM gang members and associates for drug-related offenses.  The SNM is also known for its violence and retaliation against those that go against their gang rules and show disrespect. SNM members have made multiple death threats (commonly referred to as "hits") against federal agents, prosecutors, and judges.  Based on the 6-year investigation into the SNM, they typically utilize other members and/or associates outside prison to carry out their "hits."  In December 2020, the FBI received information of recent threats made by SNM members and associates against the government.  The FBI is currently investigating these threats.

### KLINE's Involvement with Firearms

41. KLINE has repeatedly been charged and convicted for firearm-related offenses.  Throughout this investigation, KLINE inquired about firearms and demonstrated his ability to access and obtain firearms as recently as January 2021.  I believe a search of the SUBJECT PREMISES and KLINE's electronic devices will reveal the location(s) of any firearms kept by KLINE.

42. During this investigation, KLINE asked CS-1 about obtaining a firearm on at least on one occasion in or around October 2020.  Around that time, two males later identified as gang members, arrived at the SUBJECT PREMISES in a vehicle with bullet holes and interacted with KLINE.  At least one male was armed with a pistol during the interaction.  Agents observed the same vehicle and individuals at a nearby residence on Shadetree Drive SW, believed to be associated with KLINE and drug trafficking activities.

43. In early January 2021, CS-2 reported that several SNM members were working together to steal drugs and firearms.  Through an individual that has a direct relationship with KLINE, CS-2 learned KLINE recently acquired several firearms from these SNM members.

44. On January 28, 2021, KLINE added a profile picture on his Facebook page depicting a female resembling KLINE's wife kneeling on a couch or bed and lighting what appears to be a cigarette.

## SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

The picture also depicts what appears to be the barrel of a pistol pointed at the female.  The barrel of the pistol appears to be closer to the camera with the female further away, which leads me to believe the person that took the picture was holding the apparent pistol and the female was unaware the picture was taken.  Based on the humorous nature of the comments (e.g., laughing faces) on KLINE's profile picture, I believe KLINE took this picture to show humor in pointing a handgun at his wife.

### Controlled Drug Buys from KLINE

45. Between June and October 2020, agents utilized CS-1 to conduct several controlled drug buys from KLINE.  The details of the controlled buys are included in the paragraphs below.  The exact dates, the amount of narcotics purchased, and the amount of government funds used to purchase the narcotics are known to law enforcement; however, these details are being purposely omitted from this affidavit to protect the CS.  The controlled buys outlined below were recorded, unless stated otherwise.

46. Every time the CS participated in a controlled drug buy in this investigation, the following protocols were followed:

    A.  Agents met with the CS and searched the CS for contraband;

    B.  The CS was provided with official law enforcement funds for the controlled buy;

    C.  Agents followed the CS to and from the SUBJECT PREMISES;

    D.  Agents conducted surveillance on the CS and the SUBJECT PREMISES during the buy;

    E.  After the buy, agents met the CS at a predetermined location and collected the evidence;

    F.  After the buy, the CS was searched and agents debriefed the CS.

47. No contraband items were found on the CS during the pre- and post-buy searches conducted in this investigation.

### SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

**48.** In June 2020, CS-1 obtained multiple Suboxone strips from KLINE at the SUBJECT PREMISES and at another location, during a controlled operation. The controlled buy protocols described above were followed. KLINE and CS-1 utilized their cellular phones and arranged to meet at the SUBJECT PREMISES. KLINE first provided one Suboxone strip to CS-1 at the SUBJECT PREMISES. Based on the recording, KLINE stated he was planning on sending more suboxone strips (to the jail). KLINE then directed CS-1 to wait at another location (not the SUBJECT PREMISES), and KLINE went from the SUBJECT PREMISES to a third location and returned with multiple Suboxone strips and handed them to CS-1. During this interaction, no official government funds were utilized because KLINE agreed to provide Suboxone strips to CS-1 at no cost. The Suboxone was individually packaged in small envelopes that read "Suboxone (buprenorphine and naloxone) sublingual film."

**49.** In June 2020, CS-1 made a controlled purchase of over 5 grams of methamphetamine from KLINE, during a controlled operation. The controlled buy protocols described above were followed. KLINE and CS-1 utilized their cellular phones and arranged to meet at the SUBJECT PREMISES. Based on the recording, KLINE was expecting the drugs to arrive at the SUBJECT PREMISES. After waiting at the SUBJECT PREMISES for some time, KLINE made a phone call and then asked CS-1 to go to another location. KLINE and CS-1 went from the SUBJECT PREMISES to another location. KLINE then went to a third location and returned with the drugs to the previous location. KLINE gave the drugs to CS-1. The substance purchased from KLINE field tested positive for methamphetamine.

**50.** In or around September 2020, CS-1 met KLINE at the SUBJECT PREMISES and discussed future drug deals. During this encounter, KLINE went to another location and returned to the SUBJECT PREMISES with blue pills. CS-1 described the blue pills as "M-30's." Based on my

**SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

training and experience, "M-30's" is a common street term used for fentanyl pills for the imprints "M" and "30" on the pill.  KLINE offered to sell pills to CS-1.  KLINE also asked CS-1 if he needed more methamphetamine.  CS-1 declined the offer at that time, and KLINE agreed to sell drugs to CS-1 at a later time.  This interaction was not recorded.

51. In October 2020, CS-1 made a controlled drug purchase of over 5 grams of methamphetamine from KLINE at the SUBJECT PREMISES.  The controlled buy protocols described above were followed.  KLINE and CS-1 utilized their cellular phones and arranged to meet at the SUBJECT PREMISES.  During this operation, KLINE went from the SUBJECT PREMISES to another location and then returned to the SUBJECT PREMISES with the drugs.  The substance purchased from KLINE field tested positive for methamphetamine.

52. KLINE utilized his cellular telephone to communicate with CS-1 regarding the controlled buys described above.  Based on text messages, I am aware KLINE's utilized the same number to communicate with CS-1 between June 2020 and November 2020.  Based on a recorded jail call on January 15, 2021, I believe KLINE continues to utilize the same phone.  I believe the phone remains active, and that KLINE will be in possession of his cellular telephone during the execution of this warrant.

### Other Evidence of KLINE's Drug Trafficking

53. Based on source information and KLINE's criminal past, KLINE appears to be an experienced, well rounded criminal and is constantly aware of his actions and the consequences.  For example, in a recorded conversation around October 2020, KLINE utilized code words to refer to drugs, in an apparent attempt to disguise his criminal activities and drug trafficking.  During the same conversation, KLINE also talked about generating profits from drug sales and said something along the lines of "Felonies ain't free."

## SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

54. Based on evidence obtained during this investigation, including but not limited to the controlled purchases outlined above, I learned KLINE and others utilize legal mail to smuggle narcotics into the Torrance County Detention Facility (TCDF).  During a recorded interaction with CS-1 in June 2020, KLINE stated that he utilizes an electronic template listing the name of real attorneys with the Federal Public Defender's (FPD) office, FPD's real address, and the name of the inmate to receive the drugs.  KLINE then mails the package to the inmate going through several steps to avoid detection.  KLINE appears to use an editable template similar to those letter templates available on computer software, such as Microsoft Word.  After concealing drugs inside the mail, KLINE goes to a mailing service provider and utilizes their formal equipment (e.g. ink stamps) and pays in cash.  Based on the information KLINE provided during the recorded interaction with CS-1, and other information collected in this investigation, I believe KLINE has significant experience and has been involved in smuggling drugs into jails for years.  Concerning this investigation, I believe KLINE has conspired with TCDF inmates and others to smuggle drugs into TCDF as early as December 2019 and possibly earlier.  Based on KLINE using an electronic template to further this scheme, I believe evidence related to it will be located in the SUBJECT PREMISES, including electronic devices stored there.

55. In January 2021, CS-2 reported KLINE was selling ounce quantities of methamphetamine and heroin, based on CS-2's connection to Buyer 1 referenced in paragraph 35, who has purchased drugs from KLINE on numerous occasions over time.  CS-2 is aware that Buyer 1 obtained drugs from KLINE in early January 2021.  CS-2 learned that KLINE was also known to be sending narcotics to BOP inmates and other inmates incarcerated in New Mexico.  KLINE would utilize legal mail to send the narcotics.  I believe this information provided by CS-2 is accurate, because, as described above, I personally obtained evidence of KLINE's involvement with sending

### SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

narcotics to jails through legal mail prior to CS-2's reporting. Specifically, KLINE provided instructions to CS-1 on how to use legal mail to send narcotics into jail, in a recorded interaction. Furthermore, KLINE admitted to previously sending drugs into jail.

56. Based on BOP reports I obtained during this investigation, KLINE also admitted to using Suboxone while he was an inmate in BOP. Therefore, I believe KLINE has been familiar with methods to send and/or receive narcotics in prison for several years.

57. On January 15, 2021, during a recorded phone call with his brother (an inmate at TCDF), KLINE talked about JUDE SCHULTE shooting at his vehicle. Based on KLINE's description, it appeared as if KLINE and SCHULTE may have had an argument. KLINE stated SCHULTE pulled a gun and shot at KLINE striking and damaging KLINE's vehicle. According to KLINE, SCHULTE then asked KLINE to make sure SCHULTE's name did not come out in connection to the shooting. SCHULTE was apparently going to pay KLINE for the damages. I queried several law enforcement agencies, and there were no reports or records associated with this shooting incident. Based on my training and experience, individuals involved in ongoing criminal activities tend to not report crimes against them to avoid attention and contact with law enforcement. On December 15, 2020, KLINE was identified as the subject of a shoplifting incident in Albuquerque. Witnesses noted his license plate and described him as the subject driving away in the truck. Based on the vehicle description, the license plate, and other information I obtained during this investigation, I believe the vehicle reported during this shoplifting incident was the same vehicle damaged by SCHULTE during the shooting. Based on the shoplifting incident and the recorded jail call, I believe the shooting incident between SCHULTE and KLINE occurred between December 15, 2020, and January 15, 2021. On January 25, 2021, KLINE's vehicle was parked in a restricted zone at the Albuquerque airport. When law enforcement attempted to contact the driver, the

**SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

vehicle fled from the officers.

58. During a recorded jail call in or around March 2020, KLINE and his brother (an inmate at TCDF) also discussed getting drugs from SCHULTE.  Based on this call, KLINE's brother expected KLINE to obtain drugs from SCHULTE and mail them to the jail.  Through this investigation, I learned SCHULTE has been an associate of KLINE and his brother for many years.  SCHULTE and known SNM members were subjects of a drug investigation involving a multi-kilogram drug operation tied to a Mexican cartel.  In 2013, SCHULTE was charged and convicted for a drug offense, and he was sentenced to BOP and probation.  When SCHULTE was charged in federal court, SCHULTE was on state probation in connection to a murder case.

59. KLINE's vehicles and license plate also have been reported in connection to an Albuquerque drug house (not the SUBJECT PREMISES) on at least two occasions between November 2020 and January 2021.  Law enforcement records show over 50 reports by civilians and neighbors of this drug house, over the past several months.  Many of the complaints report ongoing drug trafficking activities occurring at this house.  KLINE was listed as the registered owner of two vehicles reported at this drug house.  I have personally observed those vehicles at the SUBJECT PREMISES between June 2020 and January 2021.

60. Based on my training and experience, and for all the reasons set forth herein, probable cause exists to believe that KLINE is involved in drug trafficking and that the SUBJECT PREMISES contain evidence, fruits, and instrumentalities of KLINE's ongoing drug trafficking and illegal possession of firearms.

## **INDICIA OF RESIDENCE**

61. I believe KLINE resides at the SUBJECT PREMISES, because agents conducted controlled buys of illegal drugs from KLINE at the SUBJECT PREMISES and observed KLINE and KLINE's

**SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

vehicles at the SUBJECT PREMISES throughout this investigation.   I searched law enforcement and other available databases and KLINE continues to be associated with the SUBJECT PREMISES.   On January 29, 2021, I observed KLINE's vehicle parked outside the SUBJECT PREMISES.

## COLLECTION OF DNA SAMPLES

62. KLINE is a convicted felon.   His criminal history includes state and federal convictions for the following felony offenses: 1) Conspiracy to commit armed robbery; 2) Felon in possession of a firearm and ammunition (04-cr-1562); and 3) Felon in possession of a firearm and ammunition (09-cr-1757).   KLINE was sentenced to prison, probation, and parole for these offenses.   As outlined in this affidavit, I believe KLINE is engaged drug trafficking activities and illegal possession of firearms, and that the SUBJECT PREMISES contain physical evidence of those violations, including firearms and ammunition.   Based on my training and experience, I am aware that DNA evidence (found in blood, saliva, sweat, etc.) may be found on firearms, ammunition, and other evidence items collected during the search of the SUBJECT PREMISES.   I am requesting to collect DNA samples in the form of buccal (saliva) swabs from KLINE for the purpose of excluding or including him as a contributor of DNA to these or other relevant evidence items collected during this investigation.   If no evidence items are collected during the search of the SUBJECT PREMISES, agents may not collect KLINE's DNA.

## BIOMETRIC ACCESS TO DEVICES

63. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particular newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.   These biometric features

### SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

A. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device y pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

B. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android device and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

C. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then

### SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

**D.** In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

**E.** As discussed in this affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

**F.** I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked

### SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

G. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request permission to: (1) press or swipe the fingers (including thumbs) of KLINE to the fingerprint scanner of the devices found at the SUBJECT PREMISES: (2) hold the devices found at the SUBJECT PREMISES in front of the face of KLINE and activate the facial recognition feature; and/or (3) hold the devices found at the SUBJECT PREMISES in front of the face of KLINE and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that KLINE state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask KLINE to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

## CONCLUSION

64. Based on the foregoing, there is probable cause to believe that a search of the SUBJECT PREMISES will provide evidence, fruits, and instrumentalities of the violations listed in paragraph 6 above.  I submit that this affidavit supports probable cause for a warrant to search the SUBJECT PREMISES described in Attachment A and seize the items described in Attachment B.

65. I swear that this information is true and correct to the best of my knowledge.  AUSA Lou Mattei reviewed this affidavit.

## REQUEST TO SEAL AFFIDAVIT

66. Because this affidavit is part of an ongoing investigation that would be jeopardized by the premature disclosure of information herein, as well as further endanger the life of the confidential sources, I request that this affidavit be Filed Under Seal until further order of the Court.  A motion and order to seal are being submitted simultaneously with this application.

Respectfully Submitted,

Leysha López Recci
FBI Special Agent

ELECTRONICALLY SUBMITTED AND TELEPHONICALLY SWORN BEFORE ME ON FEBRUARY___3___, 2021.

Honorable Kirtan Khalsa
United States Magistrate Judge

**ATTACHMENT A**

*Property to be searched*

The property to be searched is **2208 Desert Breeze Drive SW, Albuquerque, New Mexico**, hereinafter the "SUBJECT PREMISES," further described as a single-story home with white siding and the numbers "2208" posted on the front of the residence.  There appears to be a surveillance camera in front of the residence.



The search of the above SUBJECT PREMISES shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the SUBJECT PREMISES, and all persons located on the SUBJECT PREMISES in or on which the items to be seized could be concealed.  The search shall also include all vehicles parked at, or in front of, the SUJECT PREMISES that have an apparent connection to the SUBJECT PREMISES and/or the SUBJECTS.  Connection to the vehicle may be established by evidence that anyone residing at the SUBJECT PREMISES and/or the SUBJECTS own, operate, and/or have access to any vehicle parked at or in front of the SUBJECT PREMISES.  Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**Person to be searched:**

This warrant also authorizes a search of the person of MICHAEL KLINE (born in 1976), who resides at the SUBJECT PREMISES and is pictured to the right, in the form of collection of DNA samples, via buccal swabs.



## ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. § 841(a)(1); 21
U.S.C. § 846; and 18 U.S.C. § 922(g), those violations involving MICHAEL KLINE and
occurring after December 1, 2019, including:

1. DNA buccal swabs from MICHAEL KLINE (born in 1976);
2. Any documents, information, and/or communications related to inmates of prisons and jails,
   including but not limited to inmate lists, address/telephone number list, letters, jail or
   corrections reports and documents, court documents, computer generated reports/printouts,
   legal documents, detention facility inmate number lists or addresses for inmates or detention
   facilities or prisons.
3. Controlled substances, including, but not limited to, methamphetamine, heroin, fentanyl, and
   Suboxone; drug paraphernalia, scales, plastic bags, and other packaging materials.
4. United States currency, financial instruments, precious metals, jewelry and other items of
   value and/or proceeds of drug transactions.
5. Any and all drug customer lists, drug records, dealers lists, or any notes containing the
   individual names of such persons, telephone numbers, addresses of these customers or dealers,
   and any corresponding records of accounts receivable, money paid or received, drugs supplied
   or received, or cash received to pay for controlled substances or intended to pay for controlled
   substances.
6. Telephone and address books or notes containing telephone numbers and addresses of co-
   conspirators.
7. Telephone toll records for homes and/or businesses owned or controlled by suspected co-
   conspirators, or other communication devices used by them and/or their drug trafficking
   associates.
8. Messages, notes, correspondence, and/or communications between drug trafficking associates
   and inmates of a prison and/or jail.

9.  Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

10. Indications of ownership or control over any vehicles located at the place to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

11. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

12. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

13. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

14. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

15. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

16. Firearms and ammunition, including but not limited to handguns, rifles, shotguns and automatic weapons.

17. Any communication, records and information related to the acquisition or attempted acquisition of firearms and ammunition.

18. Documents, receipts, records, and any information indicating ownership and/or access to storage units or other locations where evidence of drug trafficking and firearms may be stored.

19. Digital video surveillance systems, including the associated storage media.

20. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

21. Safes, combinations or key-lock strong boxes or other secure storage containers and types of locked or containers, and hidden compartments that may contain the foregoing.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

**Biometric Access to Devices:** During the execution of the search of the premises described herein, law enforcement are also specifically authorized to compel Michael KLINE to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

a) Any devices found at the premises, and

b) Where devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments

c) For the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant

d) This warrant does not authorize law enforcement personnel to compel any other individual(s) found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device.  Further, this warrant

does not authorize law enforcement personnel to request that KLINE state or otherwise provide the password or any other means that may e used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.